Learned, J.
There are several reasons why, in my judgment, this motion should be denied.
First. It is a motion for the same injunction which is sought by the judgment asked for in the complaint (Code Civ. Pro. § 603). It is not an injunction which *390 is necessary in order that the final judgment may be effectual (Code Civ. Pro. § 604, subd. 1). And the consideration of this motion involves, in fact, the trial of the case upon affidavits. Now, it is a salutary rule that such an injunction should not be granted, except there be the greatest need therefor. Unless some immediate and irreparable injury will otherwise be done, which cannot be remedied' by the final judgment, the plaintiff should wait until the cause shall be tried. I see no such immediate and irreparable injury here. If the final judgment shall establish the plaintiff’s rights, as it claims them, the work which may be done by the defendant between this time and the time of such judgment cannot injure the plaintiff, so far as I can see (Troy & Boston R. R. Co. v. Boston, Hoosac Tunnel & W. R. R. Co.,. 13 Hun, 60). While, on the other hand, if an injunction should now be granted, and the final judgment should deny the plaintiff any relief, the injury to the defendant would plainly be great, and difficult to compute. Whatever, therefore, may be the plaintiff’s rights, on a trial of this action, I think an injunction should not now be granted (Powers v. Village of Athens, 19 Hun, 165).
Second. Again : the plaintiff insists that, by virtue of the filing of its map, it has acquired and now possesses the right to purchase the land in question, or to get title thereto by compulsory proceedings. Now, assuming for the present that this is so, I do not see why the plaintiff has not, then, a sufficient remedy, without an action of this kind. The plaintiff has only to purchase the land, or, if the present owner will not sell, the plaintiff has only to take the compulsory proceedings provided by law. By so doing the plaintiff will, on its own theory, acquire a titles and when it ■ shall have thus acquired a title, it can eject the defendant.
Whatever rights may be gained by the filing of a *391 proper map, it can hardly be urged that such rights prevent the owner of the land from going on and using it in any way he may please, until such time, at least, as the company, which has filed the map, actually acquires title to the land by purchase or compulsory proceedings. The owner is certainly not deprived of any right to use or improve the land by the mere filing of " the map. Whether he could be compensated for improvements put on the land after the filing of the map is a question which I have no occasion to examine. It is enough for the present case that he may use tile land as he pleases. So, too, it is plain that he may sell the land; and the purchaser, in his turn, may use it as he pleases. It cannot be possible that a company, which has merely filed a map under the railroad act, can, by virtue of such filing, enjoin the owner, or a purchaser from the owner, from any use whatever which such owner or purchaser may choose to make of the land.
' Yet this is what the plaintiff seeks to do. The plaintiff has no other rights than those which are gained by the filing of the map under the railroad act. The defendant is the purchaser and present owner of the land. Now, it does not matter whether the defendant is building a house or a railroad on the land. The plaintiff has no right to prevent any use which the defendant chooses to make of the■ land which it owns. Before t lie plaintiff will be in any condition to interfere with the defendant’s acts, the plaintiff will have to acquire title to the land, or, at least, to take proceedings for that purpose. At present the plaintiff is suffering no injury to any rights which it has.
The cases in which a corporation has sought to restrain another corporation from interfering with lands devoted to a public purpose (such as Housatonic R. R. Co. v. Delaware & Hudson R. R. Co., 118 Mass. 391, and the like), so far as I see, have been brought by a party in actual possession and enjoyment of the land; *392 and not by. a party who has never acquired or at- , tempted to acquire title thereto.
And it would seem that if the plaintiff should take proceedings under the railroad act to procure title to the land the defendant might be heard, so that the question now presented by the plaintiff could be then passed upon (In re City of Buffalo, 68 N. Y. 167).
Third. And it may further be said that, if this case were now on trial, the plaintiff, without further proof, would not make out a case of irreparable injury. If the purchase of the land by the defendant has taken away the plaintiff’s rights, then, of course, the plaintiff has no standing in court. If that purchase, as the plaintiff claims, has not taken away its rights, and the plaintiff has still the right to acquire the title to this land, then it is riot shown that the work which the defendant is doing is any inj ury to the plaintiff. There is no evidence that the grade which the defendant has established, and to which it is bringing this land, is not in harmony with any grade which the plaintiff has established. It may then fairly be held that any work which the defendant is doing will be beneficial to the plaintiff whenever it shall acquire title to the land in dispute (Troy & Boston R. R. Co. v. Boston, H. T. & W. R. R. Co., ut supra).
Fourth. Again : the defendant insists that the plaintiff’s maps are not sufficient to satisfy the law.
Without considering at present the question of the two routes laid down on the maps, it may be said that the maps show but a single line, and give no information whether this is a center or an exterior line of the proposed route. The maps do not give the width or the quantity of the land which the plaintiff proposes to take. And while the plaintiff may lay out its road not exceeding six rods in width, it is not required to make the road of that' width (L. 1850, c. 140, § 28, subd. 4). A conqpany may also take more land for embank *393 ments and cuttings. Thus, even if it were stated that the line on the maps was the center line of the. road, the maps would not show definitely what land the plaintiff proposed to take. The maps do not show the farm lines, nor generally the names of owners. Many of the highways are not shown. Nor do the profiles which are given on the maps determine whether the line laid down is a center or an exterior line. If it were stated in the maps that this was a center line, then, in some places, the profiles might perhaps aid in locating it. In some places they might not. That would depend on the circumstance whether the land on each side laterally of the place where the centerline might be was or was not level, or of the same height for a considerable distance.
The affidavits show, in my opinion, that the line on the maps could not generally be laid down or located accurately on the ground. In some places this might be done, as, for instance where fixed monuments, such as houses, streams, or the bank of the river, are given. But generally I am satisfied from the affidavits on both sides, aided by a somewhat careful examination of the maps, that this could not be done. Further, whatever engineers might do, it would be hardly possible for owners to determine where the line crosses their property, and how much of their property was to be taken. Now, section 22, which requires the filing of such a map, shows that one object, and perhaps the principal object of the filing, is to enable anyone who feels aggrieved by the proposed route to propose a new route, and to have the decision of commissioners thereon (Matter of Long Island R. R. Co., 45 N. Y. 364).
: Clearly, then, the map should give full notice to all owners, or occti pants, of the route proposed, and of the part of the land of each person which it is proposed to take. This doctrine is laid down very fully, and I *394 think correctly, in Matter of N. Y. & Boston R. R. (62 Barb. 85; S. C., 12 Abb. Pr. N. S. 21). approved in Allen v. Utica R. R. (15 Hun, 80). I may be permitted also to refer to Matter of Boston, H. T. & W. R. R. Co. (10 Abb. N. C. 104).
Some cases are cited by the plaintiff to show that the maps were sufficient. They relate to the acts of public officers, commissioners of highways, in laying out roads. Such officers act on the application of some person authorized, after public notice, and on hearing of the parties interested. They are to make out a certificate describing the road (1 R. S. 514, § 63). In the case of People ex rel. Hawver v. Commissioners of Highways (13 Wend. 310), the length over each proprietor, and the quantity of land of each proprietor, was given, but only a single line. The court held that the width could be determined by calculation, and that the line must be intended to be the center line unless something appeared to show the contrary. In Herrick v. Stover (5 Wend. 580), the surveyor testified that he ran the line as .a center. The width of the road was shown by the quantity of the land taken.
' These cases, and those like them, arise upon the acts of public officers. And if there is anything imperfect in their written orders, a reasonable intendment should supply the defect. But the maps' which the plaintiffs filed are their own. No one has had notice of them. They are designed as a step to the compulsory taking of property. Those whose property is to be taken are entitled to definite notice, and are not to be left to conjecture.
The cases cited by the plaintiff, present imperfect records of actual decisions,which distinctly laid out the highway, after hearings, as in Tucker v. Rankin (15 Barb. 471), a survey of a road made by consent. But in the present case the plaintiff, by its own act, without any consent or decision, claims to acquire *395 some right. Its maps should be definite, and they are not.
I am, therefore, of the opinion that the decision in Matter of N. Y. & Boston R. R. Co. (ut supra) is correct ; and that the plaintiff’s maps are not sufficient to enable them, at all points of its route, to acquire title by compulsory proceedings. Of course this defect would not prevent the plaintiff from purchasing any lands which it might desire. But it is not claimed that it has purchased those lands where the alleged conflict between the parties arises. And, therefore, if the plaintiff has any rights in respect to those lands, such rights must depend on its having the power to take compulsory proceedings therefor. To do this the proper map is requisite. If the plaintiff has not filed a proper map it cannot take the lands, and has no right to complain of the defendant’s acts thereon. And if the defendant, now having the title, could, in such compulsory proceedings, set up the imperfection of the map, as In the Matter of N. Y. & Boston R. R. Co. (ut supra), clearly it can do so in opposition to the present motion.
Fifth. The plaintiff’s maps show, throughout the most of the route, two distinct lines ; one called the interior line, and the other the river line. At the southern terminus of the state line, these two lines are some thirty or forty miles apart, and they run at varying distances until they unite not far from the city of Albany. The defendant insists that the laying out of two lines is fatal to both. The plaintiff insists that only the river line is in accord with its articles of association ; and that the other line is to be disregarded. These articles describe the road as ‘1 from the line between the States of Hew York and Hew Jersey, in the county of Rockland, in the State of Hew York ; thence northerly along the Hudson river, in and as near the same as practicable, by the most eligible route to the city of Albany.” How, I do not think that this lan *396 guage would preclude the plaintiff from building its road in the interior line. The words “ the most eligible route,” imply a right of choice based on all the circumstances. A river route might be too expensive. The United States property at West Point might be an obstacle. I think, therefore, that if the plaintiff had properly laid out this interior route, there would not have been such a conflict between it and the route described in the articles of association as would have prevented the plaintiff from acquiring the needed land.
If the filing of a map under section 22 had the effect which seems to be claimed-for it by the plaintiff, that of giving the company vested rights in the land, then I should think that it was not in the power of a company to lay down two routes on its map; and thus to obtain such rights in respect to each. If it could lay down two, it might lay down more, and might thus effectually obstruct all other similar enterprises.
But as I give no such effect to the filing of the map, but consider it only a means of informing the land owners of the proposed route, I am not prepared to say that the filing of a map containing several routes is void under the statute. On any application to acquire title, the company would evidently be obliged to designate the route they had, in fact, selected, even in the giving of notice to the occupants.
Sixth. Again: whatever may be the law of other States as to the locating of routes of railroads, it is, I think, clear that, under our statute, the filing of the map, required by section 22, even if the map be as complete as possible, does not definitely establish the route.
i In the first place, the line is but a “ proposed location,” and so it is called in that section. Actual notice must be given to all occupants. And within fifteen days any party feeling aggrieved may apply for a .change of route. The route, therefore, cannot be defi *397 nitely established until the fifteen days after notice shall have expired without any application, or until all applications for a change shall have been decided in the highest appellate tribunal.
And, in the second place, the directors may, by a vote of two-thirds, change the route, and such change is subject to the same provisions as to objections by persons aggrieved (§ 23). This section is important, as it shows that the filing of the map is not such a location of the route as is absolute, and such as exhausts all power of the railroad company over the matter. In no sense, then, does the filing of the map constitute a grant by the state of the special route described.
Now, it is not claimed that the plaintiff has ever served notices on the occupants, and therefore the whole route remains uncertain. Every occupant might, within the fifteen days, oppose the present location ; and it is quite probable, from this litigation, that one occupant would do so.
The general railroad act, while it permits a railroad company to propose any route which it chooses, by no means permits the company, at its own pleasure, to establish that route. The time for opposition is short, it is true, but the time is given, and is secured to all who feel aggrieved. That time begins to run only from actual service on the occupant. It is the consent of the parties evidenced by neglect to apply after actual notice, or else it is the legal adjudication which establishes the route. Not the mere filing of a map, which is a harmless act (Matter of Long Island R. R. Co., ut supra).
Seventh. It may be admitted that, without express grant, a corporation, having power to take property by the right of eminent domain, cannot exercise that right in reference to property already dedicated to public use (Matter of N. Y. Central & H. R. R. Co., 77 N. Y. *398 248, and cases there cited). But I see no reason for holding that the mere filing of a map under section 22 is such an act that the land over which the line runs is thereby dedicated to a public use. When the statute gave power to a company to take land by compulsory proceedings, the object was that no owner of land, by refusing to sell, should obstruct public traffic and travel. According to the plaintiff’s view, the statute has given a new power of obstruction. If a railroad company, by filing a map of a proposed route, can forever afterwards prevent the use of the land for railroad purposes by any other person except on its own terms, then the statute has caused a greater evil than it attempted to remove, inasmuch as .the rapacity of a corporation is often greater than that of a private person.
It is not necessary here to decide by what act and at what time such dedication is made in the case of a railroad. Certainly, as I think, it is not. done by the mere filing of a map. The map is not declared by law even to be notice to the world. On .the contrary, actual notice is to be given. And, under a general act, which permits any persons to form a railroad corporation, and to prepare and file a map on any course between the termini, it would be unreasonable that such a map should, by its mere filing, work a dedication of the land, so that it could never thereafter be taken for a public purpose. I see nothing in the statute which gives any importance to this map as vesting what might be called a right of pre-emption in the company.
Eighth. It may be that if a company should file a proper map, and should forthwith give the proper notices, and proceed with due diligence to procure the land by purchase or otherwise—it may be that, in such circumstances, the attempt of another company to interfere by taking land which the former company was in the very act of acquiring, would be so unjust and *399 inequitable that, on general principles, a court of equity would interpose. But no such case is before me.
The plaintiff was incorporated in 1866. It filed its maps in 1868. So far as appears, it has acquired title only to one piece of land; and that piece still remains in the possession of the former owner. It has never laid any railroad. It did some grading at two points in 1872, and has done none since. As late as 1878 it reported that it had paid for land, land damages, and fences, less than $16,000; for engineering and agencies less than $26,000. Judgments were recovered against it in 1876 and 1877, amounting to over $17,000. On one of these a receiver was appointed in 1876, and its property sequestrated. Besides these judgments, the report of the receiver shows that there were presented to him claims amounting to over $35,000. The receiver sued the stockholders to enforce their personal liability, and the matter was settled between them and the creditors in January, 1878. After that date the plaintiff’s reports show an increase of land, land damages and fences to about $49,000, and of engineering and agencies to about $79,000. And they show an increase of capital stock paid in from about $15,000, in 1877, to about $142,000, in 1879, and also a disappearance of a floating debt of about $29,000.
One of the claims mentioned by the receiver in his report is that of the Delaware and Hudson Canal Company for over $26,000, besides interest. This may, perhaps, be explained by the statement of Mr. Wentz, formerly chief engineer of the plaintiff, that the money for the grading above mentioned, and for the land on which it was done, was furnished by the Delaware and Hudson Canal Company.
It appears by the plaintiff’s report of 1881, that on its capital stock of $5,000,000 there is subscribed $224,100; paid in, $142,314.17. This last amount exactly equals the aggregate expended, according to the *400 report for land, land damages and fences, grading and masonry, and engineering and agencies. - The report shows no cash or cash assets on hand.
As to probabilities that the plaintiff will construct its road, the complaint avers that it has recently made the necessary arrangements to complete the construction. And the affidavit of its president states that it intends to construct its road in good faith, and that in March, 1868, it executed a mortgage on its road and franchise to the amount of $6,000,000. I fail to find in the papers any proof that the plaintiff has the means, or a reasonable expectation of obtaining the means, which are necessary for the construction of this road. A statement that it has made necessary arrangements is exceedingly vague.
In opposition, the defendant denies that the plaintiff intends to construct any railroad. And the affidavit of the president of the defendant avers, that in December, 1881, the president of the plaintiff, and subsequently another person claiming to be a large owner of stock, offered to sell out to the defendant all the franchises and property of the plaintiff, if a reasonable price could be obtained.
On the other hand, the defendant was organized in 1880. Whether validly organized, or not, is a question for the people, through the attorney-general, not for the plaintiff. It has expended $3,400,000 between Haverstraw and Esopus, besides large amounts elsewhere ; has contracted for rails, &c., to the amount of $7,500,000; has a paid-up capital of nearly $7,000,000, and has nearly 9,000 men at work. By full and elaborate maps produced on this hearing it shows that from Haverstraw to Esopus (a part which includes the alleged conflict) it has procured by purchase or otherwise nearly all of the route of its road; and the affidavits show that all but about 10,000 feet, in detached parcels, has been thus obtained. It has obtained the *401 right to bridge streams and to cross highways. Its work has been carried on openly, and, owing to the position of the route near the river, the defendant’s work has been peculiarly under public notice, and has attracted frequent attention. Without going into further detail I am satisfied that, in good faith, at large expense, and with the utmost speed, the defendant is building its road.'
The contrast between the two companies needs no comment. The railroad act was passed to facilitate, not to obstruct, railroad enterprises. Even if the plaintiff had ever had any rights in the routes laid’ down, its long delay in making use of them, and its silence when the- defendant was actively and publicly going on with this expensive work, would be reasons why it should not have the remedy which it asks. It would be a great injustice to restrain by injunction a public improvement such as that in which the defendant is engaged at the suit of a plaintiff that has really done nothing for 'sixteen years, and that shows no ability to do anything in the future.
The motion is denied, with $10 costs.
No appeal was taken.